**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

UNITED STATES OF AMERICA

v.

HERBERT E. LEWIS,

            Defendants.

**CASE NO.:
1:21-CR-00231-TCB-CMS**

## DEFENDANT LEWIS's MOTION FOR CONTINUANCE OF TRIAL DATE, OR, ALTERNATIVELY, A MOTION TO SEVER

COMES NOW the defendant, Herbert Lewis, by and through undersigned counsel, and files this Motion for Continuance of Trial or Alternatively a Motion to Sever Defendant Lewis from the Trial on Sixth Amendment Grounds. In support of the motion, Defendant Herb Lewis states as follows:

1. Defendant Herb Lewis was indicted in the Northern District of Georgia on June 9, 2021. Doc. 1. Although lengthy, this Indictment was a placeholder indictment.

2. On February 24, 2022, less than one year ago, the grand jury returned a 99-page, single spaced Superseding Indictment against seven (7) individuals, including Herb Lewis. Doc. 28.

3. The Superseding Indictment lays out a highly complex tax fraud scheme.

1

The offenses charged against defendant Lewis include conspiracy to defraud the United States, wire fraud, filing false tax returns, and aiding and assisting in the filing of false tax returns in violation of Title 18 U.S.C. §§ 371, 1343 and 2, and 26 U.S.C. §§ 7206(1) and (2).

4.  Lead counsel for Mr. Lewis is Brian Steel, Esq., The Steel Law Firm.  Mr. Steel has been Mr. Lewis's lead counsel on this matter since August 6, 2020, well before the initial, original, placeholder Indictment was returned.

5.  In the course of this case, the government has produced millions of pages of documents in discovery.

6.  On November 18, 2022, Brian Steel, Esq., notified this Court via letter that on Thursday, November 17, 2022, the Honorable Fulton County Superior Court Judge Glanville denied the State's Motion to continue trial in *State of Georgia v. Jeffery Williams et al.*, Case Number 22SC183572. *See* Exhibit A. Brian Steel represents defendant Williams in that multi-defendant, state-RICO gang trial. Thus, trial was set to commence and did commence in that case on Thursday, January 5, 2023. Judge Glanville announced that the trial is estimated to last approximately six to nine months. As of the writing of this motion, Mr. Steel is in trial in the above-referenced Fulton County case. Undersigned counsel does not have update of the anticipated length of the trial.

7.  On November 22, 2022, the government provided via email and FedEx a letter titled "Final Supplemental Discovery Letter." Accompanying the letter was a hard drive containing an additional 80,818 total documents.  Exhibit B. The actual hard drive went to Brian Steel. According to the letter, the government also provided several indexes that identified privileged documents that were withheld from production.

8.  On December 2, 2022, this Court, in response to Mr. Steel's letter notifying the Court of his conflict in schedule, issued an order notifying the parties that the Fulton County Superior Court case will not delay the trial of this case. Doc. 368.

9.  On December 20, 2023, the government via email and FedEx provided another discovery letter titled Supplemental Discovery Letter. This letter was accompanied by a hard drive containing 14,331 additional documents. Exhibit C. As with the other discovery, the actual hard drive went to The Steel Law Firm.

10. On December 23, 2022, the government disclosed to the defense the "Complete Statement of Opinions of Charles T. Grigden, MAI," which purports to address approximately only 8 of the properties in the Indictment regarding those properties. This 26-page statement of opinion is the government's effort to comply with Rule 16 Expert Disclosure. As of the date of this motion, the government has not yet turned over its expert report related to the remaining properties that were

appraised by co-defendant Weibel and that are alleged in the Superseding Indictment.

11. On January 6, 2023, this case was certified ready for trial. Doc. 406. Another pre-trial motion was filed on January 6, 2023, as well, Doc. 408, which has not yet been ruled on. Thus, all pre-trial motions have not been ruled on.

12. On January 9, 2023, this Court set the case for trial to begin in approximately seven weeks on March 2, 2023. (No Docket Number).

13. To date, no party, neither the six defendants nor the government, has requested a continuance of trial.

14. In discussions with counsel for the government, counsel for the government estimated that consistent with the scope of the Superseding Indictment, the government's case-in-chief will take approximately 30-trial days to complete.

15. Counsel for defendant Herb Lewis has met and conferred with counsel for the government on the above motion and they do not oppose the motion for a continuance of the trial date but do object to any severance.

## **ARGUMENT**

I.    **Defendant Lewis Is Forced To Proceed To Trial Without Counsel Of Choice In Violation of Defendant Lewis's Sixth Amendment Rights.**

4

Because Mr. Steel is unable to participate in the trial as currently scheduled, Mr. Lewis asks that this Court grant a continuance of the trial, or, alternatively, to sever Mr. Lewis from the current trial. Failure to do so would be a grave injustice and would deprive Mr. Lewis of his Sixth Amendment right to counsel of his choosing.

The right to counsel secured by the Sixth Amendment includes the right to counsel of choice as one element of this basic guarantee. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 152 (2006); *see Wheat v. United States*, 486 U.S. 153, 159 (1988); *Powell v. Alabama*, 287 U.S. 45 (1932). The Sixth Amendment right to counsel of choice commands, not that a trial be fair, but that a particular guarantee of fairness be provided – that is, that the accused be defended by the counsel he believes to be best. *United States v. Gonzales-Lopez*, 399 F.3d 924, 929 (8th Cir. 2005), *aff'd*, 548 U.S. 140 (2006). The constitutionally guaranteed right to counsel has been described as, "a right of the highest order." *United States v. Proctor*, 166 F.3d 396, 402 (1st Cir. 1999). Indeed, as the Eleventh Circuit opined "[t]he interest in permitting a criminal defendant to retain counsel of his choice is strong, and deserves great respect." *United States v. Hobson*, 672 F.2d 825, 828 (11th Cir. 1982).

"Lawyers are not fungible, and often the most important decision a defendant makes in shaping his defense is his selection of an attorney." *United States v. Mendoza-Salgado*, 964 F.2d 993, 1015 (10th Cir. 1992); *accord United States v. Laura*, 607 F.2d 52, 56 (3d Cir. 1979). Where a defendant can privately retain counsel, "the choice of counsel rests in his hands, not in the hands of the state." *United States v. Collins*, 920 F.2d 619, 625 (10th Cir. 1990).

Like the denial of the right to self-representation and the denial of the right to counsel, the denial of the right to be represented by one's selected attorney "infects the entire trial process" from "beginning to end." *United States v. Gonzales-Lopez*, 399 F.3d 924, 929 (8th Cir. 2005), *aff'd*, 548 U.S. 140 (2006). The erroneous deprivation of the right to counsel of choice qualifies as structural error, is not subject to harmless-error analysis, and entitles a defendant to automatic reversal on appeal. *Gonzalez-Lopez*, 548 U.S. 140 (2006). Harm is presumed because it, "casts such doubt on the fairness of the trial process, that it can never be considered harmless error." *Penson v. Ohio*, 488 U.S. 75, 88 (1988) (citing *Satterwhite v. Texas*, 486 U.S. 249, 256 (1988).

Thus, if this Court fails to grant Defendant Lewis a continuance of trial until Mr. Steel is available to participate as lead counsel, it will leave Mr. Lewis without his chosen trial counsel. Defendant is left with counsel - but not the counsel of his

choice. For the foregoing reasons, this Court should grant Defendant's motion for continuance of trial.

## II.    Alternatively, Defendant Lewis Seeks A Severance of His Trial

Federal Rule of Criminal Procedure 8(b) provides that "[t]wo or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Fed.R.Crim.P. 8(b). Once defendants are indicted together, there is a preference that they be tried together. *See Zafiro v. United States*, 506 U.S. 534, 537 ("[T]here is a preference in the federal system for joint trial of defendants who are indicted together"); *United States v. Rusher*, 966 F.2d 868, 877 (4th Cir.1992) ("[D]efendants indicted together should be tried together"). Joint trials of defendants charged with illegal activities arising out of the same events promote efficiency and judicial economy. *Zafiro*, 506 U.S. at 537 (citation omitted).

A court may sever a joint trial, however, under Federal Rule of Criminal Procedure 14. This rule provides that "[i]f the joinder of offenses or defendants in an indictment ... appears to prejudice a defendant or the government, the court may ... sever the defendants' trials...." Fed.R.Crim.P. 14. A court's discretion to sever should be exercised "only if there is a serious risk that a joint trial would

compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. A defendant is not entitled to severance merely because he might have had a better chance of acquittal in a separate trial. *United States v. Lighty*, 616 F.3d 321, 348 (4th Cir.2010).

As stated above, severance of defendant Herb Lewis is appropriate because going to trial as currently scheduled would deny defendant Lewis of his Sixth Amendment right of his counsel of choice. Thus, defendant Lewis meets the requirements for a severance under Rule 14. The Court should not deny defendant Lewis his counsel of choice by ordering him to stand trial on March 2, 2023, as currently scheduled

## **CONCLUSION**

For the foregoing reason, the Court should grant the defendant's Motion for Continuance, Or, Alternatively, the Motion to Sever Defendant Lewis from the trial that has been set for March 2, 2023.

Respectfully submitted this 10th day of January, 2023.

_/s/ Randy S. Chartash_
Randy S. Chartash
Georgia Bar No. 121760
randy@chartashlaw.com
Chartash Law, LLC
3151 Maple Dr., NE
Atlanta, GA 30305
Tel: 404-333-2423

/s/ Brian Steel
Brian Steel
Georgia Bar No. 677640
The Steel Law Firm, P.C.
1800 Peachtree Street, Ste 300
Atlanta, GA 30309
404-605-0023 (Phone)
404-352-5636 (FAX)
www.thesteellawfirm.com
***Attorneys for Defendant Herbert Lewis***

# EXHIBIT A

# 11.18.22 LETTER TO UZMA WIGGINS



# THE STEEL LAW FIRM, P.C.
*ATTORNEYS AND COUNSELORS AT LAW*

1800 PEACHTREE STREET, N.W.
SUITE 300
ATLANTA, GEORGIA 30309

TELEPHONE  (404) 605-0023
FACSIMILE  (404) 352-5636
E-MAIL  thesteellawfirm@msn.com

November 18, 2022

**VIA E-MAIL ONLY**

Ms. Uzma Wiggins
c/o The Honorable United States District Court Judge Batten
75 Ted Turner Drive SW
Atlanta, GA 30303

      Re:    <u>United States of America v. Herb Lewis</u>, Case No. 1:21-CR-231

Dear Ms. Wiggins:

      I hope that all is well with you and your Honorable Court, always. I am writing to your Honorable Court on behalf of the Honorable Randy Chartash, Esq. and my client, Mr. Herb Lewis, in the above-referenced case. For scheduling purposes for Mr. Lewis, please note that on Thursday, November 17, 2022, the Honorable Fulton County Superior Court Judge Glanville denied the State's Motion to continue trial in <u>State of Georgia v. Jeffery Williams et al.</u>, Case Number 22SC183572. Thus, trial is set to commence on Thursday, January 5, 2023. The Honorable Judge Glanville announced that this trial is estimated to last approximately nine (9) months and I am lead counsel on behalf of Mr. Williams. I am also lead counsel for Mr. Lewis in the above-referenced case.

      I write the above to alert your Honorable Court and the parties of my upcoming trial schedule.

      If your Honorable Court has any questions or concerns, please advise. It is an honor to practice before your Court. I hope that your holiday season is wonderful.

      Sincerely,

      S/ Brian Steel

      Brian Steel

BS/ce
cc:    Brittney Campbell, Esq. (via e-mail)

Grace Albinson, Esq. (via e-mail)
Daniel Bradley, Esq. (via e-mail)
Brett Switzer, Esq. (via e-mail)
Robert Ambler, Esq. (via e-mail)
J. Hall, Esq. (via e-mail)
Antoinette Ellison, Esq. (via e-mail)
Sharnell Simon, Esq. (via e-mail)
Suzanne Hashimi, Esq. (via e-mail)
Brian Mendelsohn, Esq. (via e-mail)
Michelle McIntyre, Esq. (via e-mail)
A.C. Lake, Esq. (via e-mail)
Craig Gillen, Esq. (via e-mail)
Parker Tobin, Esq. (via e-mail)
Randy Chartash, Esq. (via e-mail)
Mr. Herb Lewis (via e-mail)
Ms. Trisha Renaud (via e-mail)

# EXHIBIT B

# 11.22.22 FINAL SUPPLEMENTAL DISCOVRY LETTER

DEFENDANT'S
EXHIBIT

B



**U.S. Department of Justice**

**Tax Division**

*Southern Criminal Enforcement Section*
*P.O. Box 972*
*Washington, D.C. 20044*
*202-514-5145 (v)*
*202-514-0961(f)*

5-18-25687
2018200729

November 22, 2022

Via Email and FedEx

Jamila M. Hall, C/O Antoinette Ellison
Jones Day
1221 Peachtree St. NE Suite 400
Atlanta, GA 30361

Guinevere Moore
Moore Tax Law Group LLC
2205 W. Armitage Ave., Suite 1
Chicago, IL 60647

Randy Chartash and Brian Steel
Chartash Law LLC and The Steel Law Firm, P.C.
3151 Maple Dr. NE; 1800 Peachtree St., Suite 300
Atlanta, GA 30305; Atlanta, GA 30309

Craig Gillen and Anthony Lake
Gillen Withers & Lake LLC
400 Galleria Parkway, Suite 1920
Atlanta, GA 30339

Russ Ferguson
Womble Bond Dickinson
One Wells Fargo Center
Suite 3500, 201 South College Street
Charlotte, NC  28202

Suzanne Hashimi
Federal Defender Program Inc.
101 Marietta St., Suite 1500
Centennial Tower
Atlanta, GA 30303

Re:    Discovery Production in *United States v. Lewis, et al*
         Criminal Action No. 1:21-CR-0231

Dear Counsel:

Enclosed please find the government's supplemental discovery production for the above-entitled case. This production consists of one external drive that contains electronic copies of documents gathered during the government's investigation. The external drive is encrypted with a password, which is: "KjC%%45^7C3WE32*+*&cbgtjh&4239" (without quotation marks). The government is producing these records in response to your requests for discovery, and in compliance with Fed. R. Crim. P. 16, the Court's

pretrial order, and other relevant legal authority (*e.g.*, *Brady v. Maryland*, 373 U.S. 63 (1963), *United States v. Giglio*, 405 U.S. 150 (1972)).  The Bates range for these documents is Bates range USPROD-06032798 – USPROD-06033153 [22 total slip sheets related to the government's privilege log as described below] and USPROD-06033154 – USPROD-06791354 [80,818 total documents].

We are producing these records to you as load-ready files with associated metadata to assist you in your review. We have also created a corresponding index referencing Bates Numbers (and in most cases, original file names) for various categories of discovery. A copy of the government's discovery production index is attached to this letter. Additionally, we are providing you with an overlay that will mirror the folder structure and organization that the United States uses in its Relativity database.

Please notify us promptly if you are missing any pages or have difficulty opening any of the files. In the absence of any notification, the government will presume that you have received the supplemental discovery documents, as well as prior productions, in their entirety.

*Categories of Documents*

As you are aware, the government has been investigating the syndicated conservation easement transactions organized, promoted, and sold by the conspirators for several years, and the United States has collected voluminous evidence regarding the members of the conspiracy.  The government has also obtained records related to various third-party facilitators and fund participants.

With this supplemental production, the government provides the defendants with 80,818 additional documents that includes the evidence that the United States believes is relevant to the prosecution of the members of the conspiracy and other substantive charges. The government is also providing slip sheets related to withheld privileged records described below and in the government's privilege log. The vast majority (more than 65,000) of the records in this supplemental production are related to a subpoena response from Inland Capital Management. The government understands Inland Capital Management's subpoena response remains ongoing. As additional productions are made to the government, the government will produce those records to the defendants. Other categories of records produced through this production include the following:

(1)     SERLC Filter Reviewed and Released Materials;

(2)     IRS Civil Exam Materials;

(3)     Various additional MOIs;

(4)     IRS OPR Files Related to Clay Weibel;

(5)     AgeeFisherBarrett Materials (AFB);

(6)     Various tax court litigation materials; and

(7)     Other records as explained in the attached discovery index.

*Topics for Flagging*

The government found that certain materials that had been previously disclosed were unviewable because they were uploaded without removing certain password protections. The following 8 documents were identified as documents that were unviewable for this reason. This production includes an overlay which should make these records viewable to you. Please let us know if you have any additional trouble with the following records:

(1)     USPROD-03350701;

(2)     USPROD-03350706;

(3)     USPROD-03350612;

(4)     USPROD-03350662;

(5)     USPROD-03882647;

(6)     USPROD-03882671;

(7)     USPROD-03882912; and

(8)     USPROD-03883810.

Further, there was one audio file that had been produced that could not be played, USPROD-03567246. The included overlay should fix this issue and the file should now work.

Additionally, the government's overlay re-arranges certain folders that had previously been produced. Previously, there was a government folder labeled "Do not produce" that contained subfolders. This label was incorrectly applied. The materials that were previously in this folder have been re-foldered to 01 IRS → 17 – Misc IRS folder. Finally, a defense attorney reached out to express a concern regarding missing metadata. The included overlay reproduces various metadata fields for records, which should alleviate any such concern. Rather than provide this information to just defendants who requested it, the government is reproducing the metadata to all the defendants.

*Government's Privilege Log*

In the government's prior August 4, 2022, supplemental discovery letter, we explained that we did not intend to turn over Tax Court litigation involving the SCE Funds. Based on one or more defendants reaching out and requesting these records to be produced, the government is turning over the Tax Court litigation records it has collected and is providing a privilege log for related documents that are not being turned over. Of the 356 files, only 25 have been marked as privileged. The attached privilege log contains information on the limited records that are being withheld for privilege.

Further, there are instances where a document [usually an email] was withheld for privilege, but attachments or other related 'family' records are being produced. To account for this, the government has included privilege slip sheets in this production. Further, to maintain 'family' groupings, two additional records are included on the privilege log as they have an associated slip sheet.

*Production from AFB*

During the government's investigation, subpoenas were issued to AFB for records. AFB made several productions and those records have been produced to the defendants through prior discovery productions. However, the government realized that AFB's February 16, 2021, production had not been properly downloaded or processed. The government requested AFB to make this production available again for download. AFB made the production available for download and it is being produced through this supplemental production.

*OPR's File Concerning Clay Weibel*

To fulfill its discovery obligations, the government requested the IRS's Office of Professional Responsibility (OPR) to provide it with its file concerning Mr. Weibel. In response, OPR provided the government with various materials with certain third-party taxpayer information redacted, including information related to Mr. Weibel's spouse. OPR also redacted certain internal IRS records reflecting OPR's deliberative process with respect to Mr. Weibel's matter. The government has not applied any additional redactions on the OPR records since receiving them.

*Government's Request for Reciprocal Discovery*

The United States renews its request for a copy of all discovery to which it is entitled under the law and Fed. R. Crim. P. 16(b), (c), and (d), and Local Criminal Rule 16.1. The United States also requests notice of intent to use an alibi defense, pursuant to Fed. R. Crim. P. 12.1, and notice of intent to use an insanity defense, and any expert evidence you may use to support the insanity defense, as required under the law, Fed. R. Crim. P. 12.2, 16(b)(1)(B) and (C).

We also wish to remind you that Fed. R. Crim. P. 12.3(a) requires you to provide the Government with written notice if defendant intends to claim a defense of actual or believed exercise of public authority on behalf of a law enforcement or Federal intelligence agency at the time of the alleged crime.

The Government seeks a response to our Rule 12.2 and 12.3 requests within the time period allowed by the Court for the filing of motions.

The government also requests that the defendants disclose prior statements of witnesses they will call to testify.  *See* Fed. R. Crim. P. 26.2; *United States v. Nobles*, 422 U.S. 225 (1975).  We request that such material be provided on the same basis upon which we agree to supply the defendant with Title 18, United States Code, Section 3500 material relating to government witnesses.

*Notices*

By this letter, please be advised that the United States intends to use at trial any of your client's prior convictions, crimes, wrongs, or acts, as permitted by law (*see, e.g.*, Fed. R. Evid. 404(b) and 609). In addition to this notice, the government will provide further notice to the defendants, in accordance with Fed. R. Evid. 404(b), including the general nature of any evidence of any other crimes, wrongs, or acts of the defendants that it intends to introduce at trial.  Please be further advised that the United States may present testimony from a summary witness at trial.

As you know, trial preparation requires a significant investment of the government's time and resources.  Please let us know as soon as practicable if your client is interested in exploring a resolution to this case without the need for a trial.  If your client timely informs counsel for the United States of their intention to enter a guilty plea, thereby allowing the government to avoid preparing for trial, they may be eligible for an additional one level reduction in total offense level, as provided by U.S.S.G. § 3E1.1(b).  Conversely, if your client pleads guilty to any of the charges in the Indictment against them after the United States has taken substantial steps to prepare for trial, counsel for the United States may not agree to move the Court for the "third level" reduction for acceptance of responsibility.

Please contact us with any questions, including the possibility of a pre-trial resolution of this matter.

Sincerely,


Richard Rolwing

Jessica A. Kraft
Nicholas Schilling
Grace Albinson
Parker Tobin
Brittney Campbell
Trial Attorneys
U.S. Department of Justice, Tax Division

Enclosures

1. Government Discovery Production on external drive
2. Index of Government's Discovery Production
3. Government's Privilege Log

# EXHIBIT C

# 12.20.22 SUPPLEMENTAL DISCOVERY LETTER



DEFENDANT'S
EXHIBIT

**C**



**U.S. Department of Justice**

**Tax Division**

*Southern Criminal Enforcement Section*
*P.O. Box 972*
*Washington, D.C. 20044*
*202-514-5145 (v)*
*202-514-0961(f)*

5-18-25687
2018200729

December 20, 2022

Via Email and FedEx

Jamila M. Hall, C/O Antoinette Ellison
JONES DAY
1221 Peachtree St. NE Suite 400
Atlanta, GA 30361

Guinevere Moore
Moore Tax Law Group LLC
2205 W. Armitage Ave., Suite 1
Chicago, IL 60647

Randy Chartash and Brian Steel
Chartash Law LLC and The Steel Law Firm, P.C.
3151 Maple Dr. NE; 1800 Peachtree St., Suite 300
Atlanta, GA 30305; Atlanta, GA 30309

Craig Gillen and Anthony Lake
Gillen Withers & Lake LLC
400 Galleria Parkway, Suite 1920
Atlanta, GA 30339

Russ Ferguson
Womble Bond Dickinson
One Wells Fargo Center
Suite 3500, 201 South College Street
Charlotte, NC  28202

Suzanne Hashimi
Federal Defender Program Inc.
101 Marietta St., Suite 1500
Centennial Tower
Atlanta, GA 30303

Re:    Discovery Production in *United States v. Lewis, et al*
          Criminal Action No. 1:21-CR-0231

Dear Counsel:

Enclosed please find the government's supplemental discovery production for the above-entitled case. This production consists of one external drive that contains electronic copies of documents gathered during the government's investigation. The external drive is encrypted with a password, which is: "HbU&vE3$^Xc328&&" (without quotation marks). The government is producing these records in response to your requests for discovery, and in compliance with Fed. R. Crim. P. 16, the Court's pretrial order, and

1

other relevant legal authority (*e.g.*, *Brady v. Maryland*, 373 U.S. 63 (1963), *United States v. Giglio*, 405 U.S. 150 (1972)).  The Bates range for these documents is Bates range USPROD-06791355-USPROD-06876006.

We are producing these records to you as load-ready files with associated metadata to assist you in your review. We have also created a corresponding index referencing Bates Numbers (and in most cases, original file names) for various categories of discovery. A copy of the government's discovery production index is attached to this letter.

Additionally, the government moved a few folders (and their contents) within its database.  The folder paths have been changed as follows:

| Original Relativity Folder Path | New Relativity Folder Path |
|---|---|
| Fisher Investigation\\~Case Team - Pros Docs\\03 Third Party Subpoena Responses\\02 - Appraisers\\Roberts - Charlotte NC Scanned Docs | Fisher Investigation\\~Case Team - Pros Docs\\02 Search Warrants\\BRB Appraisals SW (Roberts)\\Roberts - Charlotte NC Scanned Docs |
| Fisher Investigation\\~Case Team - Pros Docs\\03 Third Party Subpoena Responses\\02 - Appraisers\\Terry Roberts\\~Large_IRS_Data_2020.03.12 - Roberts Data - Promoted | Fisher Investigation\\~Case Team - Pros Docs\\02 Search Warrants\\BRB Appraisals SW (Roberts)\\~Large_IRS_Data_2020.03.12 - Roberts Data – Promoted |
| Fisher Investigation\\~Case Team - Pros Docs\\03 Third Party Subpoena Responses\\02 - Appraisers\\Terry Roberts\\Email SW | Fisher Investigation\\~Case Team - Pros Docs\\02 Search Warrants\\Google\\Terry Roberts (Walter.Roberts BRBAppraisal.com) |
| Fisher Investigation\\~Case Team - Pros Docs\\03 Third Party Subpoena Responses\\02 - Appraisers\\Terry Roberts\\Terry Roberts Dropbox\\Site 4 Data - NC - Dropbox\\ | Fisher Investigation\\~Case Team - Pros Docs\\10 Other\\Site 4 (NC) - Roberts Dropbox (Consent) |

 Accordingly, we are providing you with an overlay that will enable you to mirror the updated folder structure and organization that the United States uses in its Relativity database.

Please notify us promptly if you are missing any pages or have difficulty opening any of the files. In the absence of any notification, the government will presume that you have received the supplemental discovery documents, as well as prior productions, in their entirety.

*Categories of Documents*

As you are aware, the government has been investigating the syndicated conservation easement transactions organized, promoted, and sold by the conspirators for several years, and the United States has collected voluminous evidence regarding the members of the conspiracy.  The government has also obtained records related to various third-party facilitators and fund participants.

With this supplemental production, the government provides the defendants with 14,331 additional documents that includes the evidence that the United States believes is relevant to the prosecution of the members of the conspiracy and other substantive charges. The vast majority (more than 14,300) of the records in this supplemental production are related to a subpoena response from Inland Capital Management. The government understands Inland Capital Management's subpoena response remains ongoing. As additional productions are made to the government, the government will produce those records to the defendants. Other categories of records produced through this production include the following:

(1)     Additional MOIs;

(2)     Two audio files of interviews with Clay Weibel from November 2016 and 2017; and

(3)     Other records as described in the attached discovery index.

*Topics for Flagging*

As you are likely aware, Randall Lenz pleaded guilty in the Southern District of Florida on August 23, 2022, to one count of willfully filing a materially false tax return, in violation of 26 U.S.C. § 7206(1). Mr. Lenz's illegal conduct related to his involvement with the conspirators in this case. The Southern District of Florida's Probation Office has released a Presentence Investigation Report (PSR) related to Mr. Lenz. As you know, the PSR cannot be disclosed to you. Nevertheless, Mr. Lenz provided a statement to the Probation Office that was included in the PSR, which is provided to you below:

3

I am ashamed and embarrassed of being in this position. I rationalized what I did, even though in my heart of hearts I knew better. I took deductions in 2018 and 2019 on my tax returns in part because these investments were being offered by a lot of accountants and financial advisors with association of prominent attorneys, so I rationalized that they were legal – when in my heart of hearts, I knew they weren't.

Some of these conservation easements on the market were worse than the ones I invested in, like 10X the value of the land, so I rationalized that a 4.5X amount was "OK" to do – when it wasn't. The deals historically had been at 4.5X the purchase price of the land, based on the land's "highest and best use" rather than its market value. I rationalized this on the basis that special rules apply to these conservation easements, but turned a blind eye to the fact that historically, Jack Fisher deals were, according to him, at 4.0 or 4.5X – not 3.0, not 6.0, but 4.0-4.5X. When that happens back to back, like in 2018 and 2019, it suggested to me that that "the fix is in" in terms of the appraiser, meaning that the appraiser was shooting to value the land at 4.0 to 4.5X, regardless of its true value, whether market value or "highest and best use." Hence, the appraisals were fraudulent, no matter how much Jack Fisher said that the appraiser was qualified. The 2019 deal was 3.7 to 1. Case law has approved valuations at multiples of cash invested – I cannot say the appraisals were wrong - that is currently being litigated in civil court – but there was reason for me to research and inquire further on the valuation issue that I did not do, depending on experts utilized by Jack Fisher, which I should not have done.

I called the person at the IRS in charge of reviewing conservation easements and asked her if they were legal; she didn't tell me that the ones I invested in were or were not, all she said was that it depends on how the deal was structured. I used her statement to rationalize in my mind that "she didn't say they were illegal." But, she did say it depended on how they were structured. I knew that to be deductible, the deals had to have economic substance or a true business purpose to them, and if they didn't then the promoter was just selling tax deductions. Although the deals I invested in were promoted by Fisher on the basis that they would set aside part of the property and develop that portion, by selling it at a profit or leasing it, thereby returning to me as an investor 15-25% separate from the tax deduction, that didn't happen. Not in 2018, and not in 2019. Although promoted as having this return on investment, there never was economic substance or business purpose. I asked Fisher about the status of this promised return on investment from developing the acreage left out of the easement, and he never answered my question of "when is there going to be a return on the investment?" Because Fisher never answered my questions, in

my gut I knew the answer. As it turns out, the 2019 transaction showed 2021 taxable income that is supposed to result in a cash distribution.

I have tried to make things right, as much as possible, by amending my returns and by paying over to the IRS the money I saved by taking these illegitimate deductions. When I receive notice for the amount of interest and penalties, I will pay those as well. Doing so doesn't make what I did right; it only means I'm doing the right thing as a result of facing the music, and facing myself in the mirror. I never thought I'd end my career this way, especially in public with this shame on me and on wife and children. But I did this to myself, and I have no one to blame but myself. I hope that my cooperation with the government helps, in a small way, to right the wrong I did.

My interview with the government was cordial and resulted in a meeting of the minds on the necessary requirements for transactions of this type to be valid. Due to my own deliberate ignorance I did not confirm that the Fisher transactions had economic substance in operation – a cash return in addition to tax benefits – although an economic return was represented in the sale and marketing of these transactions. I never liked these transactions, I had larger competing CPA firms that were soliciting my better high income clients by offering them participation in these kinds of transactions. I am therefore more than willing to testify for the government to help discourage and defeat the promotion of these investments which I see as a scourge on the tax code.

My deliberate ignorance as to conservation easement transactions was enlightened in tax year 2020 when I made a small investment in a non-Fisher transaction that after much research and due diligence, I concluded was not valid (the ratio of charitable deduction to cash invested was in excess of 5 to 1 and there was no prospect of an economic cash return). I took no deduction for this transaction in year 2020. I also provided the government with the name and contact information for this group - that had offerings in tax year 2021 and has an offering scheduled for tax year 2022.

                                        */s/ Randall A. Lenz*

*Government's Request for Reciprocal Discovery*

The United States renews its request for a copy of all discovery to which it is entitled under the law and Fed. R. Crim. P. 16(b), (c), and (d), and Local Criminal Rule 16.1. The United States also requests notice of intent to use an alibi defense, pursuant to Fed. R. Crim. P. 12.1, and notice of intent to use an insanity defense, and any expert

evidence you may use to support the insanity defense, as required under the law, Fed. R. Crim. P. 12.2, 16(b)(1)(B) and (C).

We also wish to remind you that Fed. R. Crim. P. 12.3(a) requires you to provide the Government with written notice if the defendant intends to claim a defense of actual or believed exercise of public authority on behalf of a law enforcement or Federal intelligence agency at the time of the alleged crime.

The Government seeks a response to our Rule 12.2 and 12.3 requests within the time period allowed by the Court for the filing of motions.

The government also requests that the defendants disclose prior statements of witnesses they will call to testify.  *See* Fed. R. Crim. P. 26.2; *United States v. Nobles*, 422 U.S. 225 (1975).  We request that such material be provided on the same basis upon which we agree to supply the defendant with Title 18, United States Code, Section 3500 material relating to government witnesses.

*Notices*

By this letter, please be advised that the United States intends to use at trial any of your client's prior convictions, crimes, wrongs, or acts, as permitted by law (*see, e.g.*, Fed. R. Evid. 404(b) and 609). In addition to this notice, the government will provide further notice to the defendants, in accordance with Fed. R. Evid. 404(b), including the general nature of any evidence of any other crimes, wrongs, or acts of the defendants that it intends to introduce at trial.  Please be further advised that the United States may present testimony from a summary witness at trial.

As you know, trial preparation requires a significant investment of the government's time and resources.  Please let us know as soon as practicable if your client is interested in exploring a resolution to this case without the need for a trial.  If your client timely informs counsel for the United States of their intention to enter a guilty plea, thereby allowing the government to avoid preparing for trial, they may be eligible for an additional one level reduction in total offense level, as provided by U.S.S.G. § 3E1.1(b). Conversely, if your client pleads guilty to any of the charges in the Indictment against them after the United States has taken substantial steps to prepare for trial, counsel for the United States may not agree to move the Court for the "third level" reduction for acceptance of responsibility.

Please contact us with any questions, including the possibility of a pre-trial resolution of this matter.

Sincerely,

Richard Rolwing
Jessica A. Kraft
Nicholas Schilling
Parker Tobin
Trial Attorneys
U.S. Department of Justice, Tax Division

Brittney Campbell
Assistant United States Attorney

Enclosures

1. Government Discovery Production on external drive
2. Index of Government's Discovery Production

# EXHIBIT D

# 12.23.22 U.S. LETTER WITH EXPERT COMPLETE STATEMENT (ROBERTS)

DEFENDANT'S
EXHIBIT

**D**



**U.S. Department of Justice**

*Trial Attorney: Nicholas J. Schilling Jr.*

*nicholas.j.schilling@usdoj.gov*

**Tax Division**
*Southern Criminal Enforcement Section*
*P.O. Box 972*
*Washington, D.C. 20044*

December 23, 2022

**BY EMAIL**

Suzanne Hashimi; Suzanne_Hashimi@fd.org
Brian Mendelsohn; Brian_Mendelsohn@fd.org
Michelle Tatum McIntyre; Michelle_McIntyre@fd.org
Federal Defender Program Inc.–Atl.
Northern District of Georgia
101 Marietta Street, N.W., Suite 1500
Atlanta, GA 30303

*Counsel for Walter Douglas "Terry" Roberts, II*

**Re: United States v. Lewis, 1:21-cr-231 (N.D. Ga.)**

Dear Counsel:

As the government disclosed to you in October 2022, in anticipation of trial, the United States has retained Charles T. Brigden, the managing director of JLL Valuation and Advisory Services, LLC. Mr. Brigden reviewed appraisals prepared by your client, Walter Douglas "Terry" Roberts II. The government previously provided you with a Rule 16 written summary — the requirement of Rule 16 at the time your client was indicted and at the time that you made your request for an expert disclosure.

Although the government maintains that the written summary was sufficient to satisfy its obligations, out of an abundance of caution and to facilitate your preparation for trial, the United States is providing a complete statement disclosure as contemplated by the December 2022 amendment to Rule 16's expert disclosure requirements. The United States has not decided whether it will use

1

expert testimony at trial. Even so, the United States provides you with this written disclosure of Mr. Brigden's anticipated expert testimony.

Under the December 2022 Amendment to Rule 16, an expert disclosure must contain "a complete statement" of the expert witness's opinions that the government anticipates eliciting at trial. Fed. R. Crim. P. 16(a)(1)(G)(iii) (2022). A complete statement of an expert witness's opinions is more than a written summary but less than "a verbatim recitation of the testimony that the expert will give at trial." Fed. R. Crim. P. 16 advisory committee note to 2022 amendments. Next, Rule 16 requires an expert disclosure to provide the bases and reasons for the expert witness's opinions. Fed. R. Crim. P. 16(a)(1)(G)(iii) (2022). Under the amended Rule 16, a complete statement must also include the expert witness's qualifications with his publications and the cases in which the expert has testified as an expert at trial or by deposition. *See id.*

Attached to this letter is the complete statement of opinions by Mr. Charles T. Brigden. Attached as Exhibit A to Mr. Brigden's complete statement is a summary of his conservation-easement related qualifications. Attached as Exhibit B to Mr. Brigden's complete statement is a copy of his curriculum vitae, which was previously provided to you in October and November 2022. Attached as Exhibit C to Mr. Brigden's complete statement is a list of his relevant testimony in the last four years.

Finally, as a courtesy, we have included the production numbers for the eight Roberts Appraisals the expert reviewed.

| | |
|---|---|
| Chestatee | USPROD-00837880 |
| Equity Investment | USPROD-00667230 |
| NC Whisper Mountain | USPROD-00837488 |
| Mountaintop Property | USPROD-00244147 |
| Ft Myers | USPROD-00225218 |
| Thompson Mountain | USPROD-00257891 |
| River Club Holdings | USPROD-06747834 |
| Inland Bluffton | USPROD-00230657 |

Respectfully,

By: _____

Richard Rolwing
Grace Albinson
Parker Tobin
Jessica Kraft
Nicholas Schilling
Trial Attorneys
U.S. Department of Justice, Tax Division

Christopher J. Huber
Assistant United States Attorney
Northern District of Georgia

cc: Counsel for Defendants Fisher, Sinnott, Lewis, Smith, and Weibel

**Jones Lang LaSalle --- Valuation & Advisory Services**
*Complex Real Estate Analysis & Litigation Support*
The Aon Center, 47th Floor
200 East Randolph Street
Chicago, Illinois 60601



## COMPLETE STATEMENT OF OPINIONS OF CHARLES T. BRIGDEN, MAI

### I.    My Background

1.    My name is Charles T. Brigden. I am a professional real estate appraiser, real estate analyst, and real estate consultant. I am currently Managing Director of Jones Lang LaSalle (JLL) Valuation & Advisory Services, LLC, headquartered in Chicago, Illinois. I am a Certified General Real Estate Appraiser in the State of North Carolina (License No. A8546) and also hold appraiser licensure in numerous other states.[1] I have more than 25 years of experience in the analysis of real estate and over 20 years of experience as a professional real estate appraiser. I have a Bachelor of Science degree in Architecture and a Master of Science degree in Real Estate, from the University of Wisconsin-Milwaukee and the University of Wisconsin-Madison, respectively. I hold the MAI designation from the Appraisal Institute. The MAI designation is given by the Appraisal Institute (the largest professional organization of real estate appraisers) to those who complete a prescribed series of educational courses, pass a series of educational examinations, meet the appraisal experience requirements, and submit qualifying demonstration appraisal reports. I hold two additional professional designations: the CRE designation from the Counselors of Real Estate and the FRICS (Fellow) designation from the Royal Institution of Chartered Surveyors. The CRE designation is given to those invited into membership based upon their professional accomplishments as real estate

---

[1] Those states include Arkansas, California, Florida, Georgia, Illinois, Indiana, Louisiana, Michigan, Mississippi, North Carolina, Nevada, New York, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, and Wisconsin.



consultants. I am currently the Chairman of the Midwest Chapter of the Counselors of Real Estate. The FRICS designation is an international appraisal designation given by the Royal Institution of Chartered Surveyors (headquartered in London), the largest international organization of appraisers and chartered surveyors.

2.    One of my specialized areas of real estate appraisal practice involves properties encumbered by historic preservation (façade) and conservation easements. Over the past 20 plus years, I have been involved in more than 300 assignments involving the valuation of preservation and conservation easements in the following thirty states: Alabama, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, Nevada, New Jersey, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, Washington, Wisconsin and Wyoming. I have written or co-authored a number of articles and textbooks on the appraisal of real estate involving complex valuation problems and other unique assignment conditions that have been published in *The Appraisal Journal* and other professional publications.

3.    I am the co-author of <u>Appraising Conservation and Historic Preservation Easements</u>, Second Edition, a 2020 textbook on the topic published by the Appraisal Institute. This textbook represents the official guidance concerning the proper valuation methods and techniques promulgated by the Appraisal Institute, the largest professional organization of real estate appraisers. I have presented at national programs and seminars on appraisal of conservation and historic preservation easements. In 2021, together with my colleague Richard J. Roddewig, MAI, CRE, FRICS, I prepared and taught a special one-day educational course on the appraisal of conservation and historic preservation easements for appraisers in Florida and again for appraisers located in North Carolina.

4.    Attached to this complete statement are a summary of my qualifications concerning the valuation of conservation easements (Exhibit A), a complete curriculum vitae including my publications (Exhibit B), and a list of cases in which I have been deposed or have testified at trial in the last four years (Exhibit C).

## II.    Overview and Purpose of My Assignment and Statement of My Opinions

5.    I have been retained by the U.S. Department of Justice, in the case of *United States v. Lewis, et al.*, 1:21-cr-231 (N.D. Ga.) to evaluate eight appraisal reports prepared by BRB Appraisals, LLC and signed by Walter D. "Terry" Roberts (collectively the "Roberts Appraisals").[2] The Roberts Appraisals were prepared to support tax deductions at issue in that criminal case. My appraisal review assignment was performed as part of a criminal indictment against Mr. Roberts, among other defendants. I understand that my reports may be used by the U.S. Department of Justice in evaluating the role of the Roberts Appraisals as part of the alleged conspiracy to defraud the United States arising out of a promotion of fraudulent tax shelters involving syndicated conservation easements.

6.    This document is intended to represent a complete statement of my opinions concerning the Roberts Appraisals; however, this complete statement is not a verbatim recitation of my opinions because there is considerable detail, discussion, and analysis offered in the draft appraisal review reports I have prepared.

7.    The purpose of my appraisal review assignment was to: (1) examine the Roberts Appraisals and (2) assess the reliability of the data and analyses and the credibility of the Roberts Appraisals' outcomes and conclusions. I examined and assessed the Roberts Appraisals by reference to the

---

[2] I was also retained to evaluate twelve appraisals prepared by Clayton Weibel (collectively, the "Weibel Appraisals"). My review of the Weibel Appraisals is not the subject of this complete statement.

3

*Uniform Standards of Professional Appraisal Practice* (USPAP) published by The Appraisal Standards Board of The Appraisal Foundation, in Washington, D.C.

8.    The USPAP were established in 1989 and those standards were adopted by Congress that same year. The USPAP provides minimum standards required by law and regulation (as adopted at the state level) to be followed by all licensed real estate appraisers in every state. Mr. Roberts is a licensed real estate appraiser in North Carolina, South Carolina, and Georgia.[3]

9.    My review also considered additional appraisal standards and requirements addressed in Appraisal Institute textbooks, including *The Appraisal of Real Estate,* (14th edition),[4] and *Appraising Conservation and Historic Preservation Easements,* (1st and 2nd editions), among other appraisal profession literature.[5]

10.    USPAP's Scope of Work Rule requires licensed appraisers to complete the research and analyses "necessary to develop credible assignment results."[6] The USPAP Scope of Work Rule then

---

[3] Appraisal reports submitted in support of donation of partial interests in real estate (such as properties encumbered with conservation easements) must be prepared in compliance with the Uniform Standards of Professional Appraisal Practice, as well as supplemental standards for the valuation of conservation easements, including applicable Internal Revenue Service and U.S. Treasury Regulations and guidelines governing charitable gift donation deductions.

[4] *The Appraisal of Real Estate* is a peer-reviewed publication by the Appraisal Institute providing "an authoritative source of recognized methods and techniques" for real estate appraisers.

[5] *Appraising Conservation and Historic Preservation Easements* is a peer-reviewed publication by the Appraisal Institute that contains "an accurate presentation of appraisal principles and theory and an accurate application of recognized appraisal methods and techniques" for the valuation of conservation (and preservation) easements.

[6] USPAP, 2020-2021 Edition, Scope of Work Rule, p. 12, Lines 340-341. The Appraisal Foundation and the Appraisal Standards Board have extended the 2020-2021 edition to also cover appraisal work performed in 2022.

says that the acceptability of the research and analysis is measured based on what "an appraiser's peers' actions would be in performing the same or a similar assignment."[7]

11. The "Definitions" Section of the USPAP defines an "appraisal review" as "the act or process of developing an opinion about the quality of another appraiser's work (i.e., a report, part of a report, a workfile, or some combination of these), that was performed as part of an appraisal or appraisal review assignment." USPAP then specifies the content of an appraisal review: "Consistent with the reviewer's scope of work, the reviewer is required to develop an opinion as to the completeness, accuracy, adequacy, relevance, and reasonableness of the analysis in the work under review, given law, regulations, or intended user requirements applicable to the work under review."[8]

12. Real estate appraisers are obligated to comply with professional appraisal standards adopted by all 50 states and when valuing property for the purpose of supporting income tax deductions. They are further required to understand and apply the generally recognized techniques of the appraisal profession for valuing real property.[9]

---

[7] USPAP, 2020-2021, Scope of Work Rule, p. 13. The phrase "an appraiser's peers" is defined in USPAP as "other appraisers who have expertise and competency in a similar type of assignment." (USPAP, 2020-2021, Definitions, p. 3, Line 83) The answer to USPAP Frequently Asked Question 175 entitled "Judging the Actions of An Appraiser's Peers" states that "journals and publications, professional meetings and conferences, education through courses and seminars, and appraisal discussion groups" are the sources of knowledge showing what an appraiser's peers would do in a similar assignment. (USPAP, 2020-2021, FAQ 175, p. 262.)

[8] USPAP, 2020-2021 Edition, Standards Rule 3, p. 27, Lines 831-833.

[9] *See* _Appraising Conservation and Historic Preservation Easements_, p. 40: "The Pension Protection Act of 2006, and the guidance subsequently issued by the IRS, added a number of requirements. For an appraisal to be "qualified," it must be done in accordance with generally accepted appraisal standards and also in accordance with any regulations or other guidance issued by the Secretary of the Treasury. The appraisal must also include a "declaration" that "because of the appraiser's background, experience, education, and membership in professional associations, the appraiser is qualified to make appraisals of the type of property being valued" and a statement acknowledging that a "substantial or gross valuation misstatement" may subject the appraiser to a civil penalty."

13. The opinions and conclusions stated in this complete statement are based to a reasonable degree of professional appraisal certainty upon: (1) my investigation of the properties that are the subject of the Roberts Appraisals; (2) the real estate markets where the properties are located; and (3) my research and experience with the valuation of properties donated as conservation easements for tax deduction purposes in other locations throughout the United States. Should additional information become available, I reserve the right to supplement or modify these opinions.

## III. The Importance of the USPAP Ethics Rule

14. There are five "rules" included in the USPAP [10] with which all professional appraisers are required to comply. The first—and generally understood to be the most important—requirement is the so-called Ethics Rule that sets forth the requirements for integrity, impartiality, objectivity, independent judgment, and ethical conduct. The Ethics Rule of the USPAP requires that "[a]n appraiser must promote and preserve the public trust inherent in appraisal practice by observing the highest standards of professional ethics." (p. 7)

15. The portion of the Ethics Rule governing the required conduct of an appraiser states that "[a]n appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests." In addition, the following conduct is explicitly prohibited, requiring that an appraiser:[11]

- "must not perform an assignment with bias"
- "must not advocate the cause or interest of any party or issue"
- "must not communicate assignment results with the intent to mislead or to defraud"
- "must not perform an assignment in a grossly negligent manner."

---

[10] The five rules of USPAP are: Ethics Rule, Record Keeping Rule, Competency Rule, Scope of Work Rule, and the Jurisdictional Exception Rule. *See generally* USPAP 2020–2021 Ed. beginning at p. 7.

[11] Additional prohibited conduct under the Ethics Rule is included at p. 7 of USPAP 2020-2021 Ed.

As described further within this document, and as detailed in my draft review reports, it is my opinion that, although required to be, the Roberts Appraisals were not prepared in an impartial and objective manner, nor do they reflect an independent effort free of accommodation of personal interests.

16.  This conclusion is based upon an extensive review of the Roberts Appraisals and my findings concerning the appraisal conduct at work in those reports. For example, among the most serious instances of appraisal negligence pertains to the deliberate avoidance by Mr. Roberts in the application of a sales-based valuation approach. As explained later in this complete statement, the proper methodology for valuing vacant land is the use of sales of comparable properties from within the local market. Mr. Roberts acknowledges the existence of such data yet offers unsubstantiated reasons for their exclusion.[12] [13] [14]

17.  Other examples of appraiser bias, attempts to conceal or misrepresent the true nature of the donated properties, offering appraisal conclusions that are misleading, and advancing value conclusions that are grossly overstated, are extensively detailed in my draft review reports.

---

[12]  *See* Roberts's Whisper Mountain appraisal at p. 34: "The sales comparison approach for a developed residential subdivision is not used as it is extremely rare that such a project would sell as a whole and if it did it would be from a financially distressed position and would sell for a fraction of its value when marketed and sold as individual lots. Thus making this method of evaluation flawed at best." Note: This assertion by Roberts is false as the Whisper Mountain subject property was not, in fact, a "developed residential subdivision." As of the date of value the Whisper Mountain property was a tract of undeveloped raw land of extreme mountainous terrain located adjacent to a previous attempt at residential development.

[13]  *See* Roberts's Mountaintop Property Investment appraisal at p. 2: "I used the Western North Carolina Multiple Listing Service, searched county records and our own data files to compile sales data." Note: this same (or similar) statement is provided in Roberts's River Club Holdings, Thompson Mountain, and Ft Myers appraisals.

[14]  *See* Roberts's Inland Bluffton appraisal at p. 10: "I used the LoopNet, spoke with local real estate professionals, used the local Bluffton MLS, and searched county records to compile sales data. I researched capitalization rates using data from RealtyRates.com and compared those to rates experienced by local developers in the Bluffton Community. When information from these sources was inconsistent or lacking, I conferred with the selling agent involved in the transaction to clarify."

#### IV. Real Estate Appraisals Involve Opinions of Value that Must be Supported by Actual Market Data and that Must Employ an Acceptable Scope of Work

18.  *The Appraisal of Real Estate* states that "an appraisal is the act or process of developing an opinion of value of an asset." The process of appraisal is further described within the opening pages of this official textbook, as follows:

> "The value developed in an appraisal is some measure of the relative worth of the asset, usually expressed in terms of money. In other words, the appraisal quantifies to a certain level of precision what buyers and sellers would consider the relative worth of, in this case, some interest in a parcel of land and any improvements to that land.
>
> Implicit in the traditional definition of appraisal is the idea that an appraisal is someone's opinion, rather than an undeniable fact. Another useful way of describing and thinking about what an appraisal is would be to look more closely at the people who develop those opinions of value. While anyone can have an opinion of value, **appraisers are professionals with training and expertise in the accepted valuation methods and techniques who have an ethical obligation to remain disinterested and unbiased while performing an appraisal**." (p. 2, emphasis added)

19.  The same textbook includes the following discussion of the importance of the scope of work to an appraisal assignment:

> "Scope of work for an assignment is acceptable if it leads to credible assignment results, is consistent with the expectations of parties who are regularly intended users for similar assignments, and is consistent with what the actions of the appraiser's peers would be in the same or similar assignment." (p. 87)

20.  As described in detail in my draft review appraisals, the valuation methodology employed in the Roberts Appraisals ignores actual market data (sales of comparable or substitute properties from the local market) and instead superimposes a valuation technique—discounted cash flow analysis—that is not consistent with "what the actions of the appraiser's peers would be in the same or similar assignment."

21. Instead, and as described below, the Roberts Appraisals ignore actual sales data of comparable vacant land properties that could produce reliable value opinions in favor of unsupported valuation techniques that are unreliable, misleading, and lack credibility.[15] [16]

## V.    The Accepted Methodology for the Valuation of Vacant Land

22.  The appraisal of real estate involves several foundational concepts or principles that, when applied properly, allow an appraiser to determine the highest and best use of a given property and also to arrive at an opinion of value that is supported by market data. According to *The Appraisal of Real Estate*, the official textbook published by the Appraisal Institute, the largest professional organization of appraisers in the United States, a key real estate appraisal concept is the principle of substitution. The principle of substitution holds that, when more than one option exists, "the one with the lowest price attracts the greatest demand" and underscores the indisputable fact that "a buyer will not pay more for one property than for another that is equally desirable." (p. 30)

23. To properly apply the principle of substitution, the Appraisal Institute encourages appraisers to use the sales comparison approach to value vacant land, as evidenced by the following excerpts from *The Appraisal of Real Estate* textbook:

- "Usually the most reliable way to estimate land value is by sales comparison." (p. 44)

- "The other methods of land valuation . . . are subject to more limitations and are used less often in everyday appraisal practice." (p. 44)

---

[15] The use of real estate appraisal techniques (including discounted cash flow analysis) that are improperly developed and that rely upon unsupported inputs is an incontrovertible error and is in direct violation of the Ethics Rule.

[16] For purposes of charitable contributions of partial interests in real property, the Internal Revenue Code uses the term "fair market value" which is defined by the Internal Revenue Service in Publication 561 as follows: "Fair market value generally is the price that property would sell for on the open market. It is the price that would be agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the facts." This definition is also included in the Roberts Appraisals.

- "Sales comparison is usually the preferable methodology for developing an opinion of site value." (p. 364)

- "Sales comparison is the most common technique for valuing land, and it is the preferred method when comparable sales are available." (p. 364)

   "Sales comparison is the most commonly used and preferred method of valuing land. Data on sales of similar parcels of land is collected, analyzed, compared, and adjusted to reflect the similarity or dissimilarity of those parcels to the subject property." (p. 366)

24. There are instances when other valuation methods are appropriate, including the use of discounted cash flow analysis (also known as subdivision analysis).[17] As explained in *The Appraisal of Real Estate:*

   "Although the principle of substitution applies in most situations, sometimes the characteristics of a product are perceived by the market to be unique. The demand generated for such products may result in unique pricing. For example, a market may not have ready substitutes for special-purpose properties like a historic residence, medical office building, or high-tech manufacturing plant. In those situations, the appraiser may have to research substitute properties in a broader market or employ analytical techniques appropriate for limited-market properties." (p. 44)

---

[17] *The Appraisal of Real Estate* provides the following: "The application of DCF analysis is useful as a method for checking the reasonableness of value indications derived from other methods applied to estimate the value of vacant land with development potential. Comparing the value indication derived from DCF analysis with a land value indication derived using sales comparison allows an appraiser to test the feasibility of a proposed project..." (p. 553).

Many appraisers attempt to perform this type of analysis "without adequately supported development cost estimates or an adequate investigation of the available market demand needed to support the absorption of lots over time or competition from competing projects. The development costs and time required for the market to absorb the lots are some of the most sensitive components of the analysis and can have a significant effect on the land value conclusion. In markets that are oversupplied or experiencing an economic downturn, appraisers must not simply assume that market demand will stabilize at some arbitrary point in the future. Future market conditions and demand forecasts must be supported by relevant market data." (p. 373)

25.  However, as explained in my detailed draft reviews of the Roberts Appraisals, none of the subject properties are, in fact, a special purpose or limited market property and there is nothing special or unique about their physical characteristics or location. Actual "special purpose" or "limited market" properties have a narrower universe of "substitute" properties appropriate to use as comparable sales. The donated properties that are the subject of the Roberts Appraisals have no shortage of substitutes within their respective local market areas.[18] In other words, comparable sales existed within the local marketplaces, and the subject properties were not unique, so a sales comparison approach to value is the most appropriate method for valuing the donated properties.

## VI.   The Roberts Appraisals

26.  The Roberts Appraisals offered values of vacant land properties located in Georgia, North Carolina, and South Carolina, with valuation dates spanning the tax years 2013 (1), 2014 (4), 2015 (2), and 2018 (1). Six of the appraisals addressed the donation of a partial real property interest, a conservation easement. Two of the appraisals involved the donation of the entire real estate holding, a so-called fee simple interest. The properties that are the subject of the Roberts Appraisals range in size from four acres to as many as 1,921 acres.

27.  I have reviewed the Roberts Appraisals and have arrived at the following general observations. Each of the eight Roberts Appraisals suffer from four primary categories of fundamental flaws that are in direct opposition to accepted valuation methodology for appraising vacant land:

   i)   First, the tax-deduction appraisal reports misrepresent the donated properties (the eight "subject properties") from a physical, economic, and legal perspective ignoring the fact

---

[18] As demonstrated in my draft review reports, and for each of the properties analyzed, there were numerous properties in the local marketplace that had sold and that had the same (or likely, superior) marketability as the donated properties that should have been used by Roberts in a sales-based valuation approach.

that the properties are not unique within their respective local real estate markets. Generally speaking, the properties that are the subject of the tax-deduction appraisals may be characterized as vacant land with limited to no marketability from a development standpoint that have been carefully mis-identified in the Roberts Appraisals as highly marketable real estate development opportunities under a hypothetical subdivision scheme that is unsupportable.

ii) Second, the tax-deduction appraisals offer a proposed change in use from a then-current use as vacant, raw land[19] to a more desirable opportunity as a residential (and sometimes commercial) subdivision development site that is poised to receive revenues from the sale of homesites according to unreliable and misleading development schemes proffered by Mr. Roberts. These hypothetical schemes are not supported by market data, and they are advanced without the inclusion of mandatory analyses demonstrating the demand required to facilitate the hypothetical developments.

iii) Third, in every instance, and although required, the Roberts Appraisals deliberately sidestep or ignore the sales of other, similar competitive properties in the local market area. This decision resulted in the preferred appraisal method - sales comparison approach - not being used, and instead the Roberts Appraisals brazenly employ unsuitable valuation methods that result in grossly over-estimated value conclusions.

iv) Fourth, after ignoring local market evidence, each of the Roberts Appraisals include a discounted cash flow valuation model (DCF analysis) that is improperly developed, and

---

[19] This is true even for property that may have been previously developed (or attempted to be developed) when the prevailing economic conditions as of the date of value did not allow for financial success of the failed development. For example, an owner of a previously failed subdivision that is seeking bank-financing to once again restart development, would need to establish financial feasibility consistent with a robust marketability study and market analysis.

that relies upon baseless numerical inputs which result in grossly over-estimated value conclusions.

## VII. Notable Examples of Appraisal Deficiencies, Inaccuracies, and Unsupported Opinions in the Roberts Appraisals

28. The following are examples of deficiencies, inaccuracies, and unsupported opinions contained in the Roberts Appraisals.[20]

29. The Roberts Appraisals misrepresent the physical, economic, and legal characteristics of the subject properties as of the date of value and include unsupported, hypothetical subdivision development schemes for the donated properties. Consider the following factual observations that are directly contrary to misstatements and mischaracterizations about the donated properties in the Roberts Appraisals:

    i)    The Chestatee Holdings property in northern Georgia involves land adjacent to a residential development that failed to be fully developed over a span of two decades and was in bankruptcy at or near the date of Roberts's appraisal.

    ii)    The Equity Investment property in North Carolina was a former, failed development of 1,921 acres containing 26% wetlands that was alleged to be a development capable of selling 3,087 homesites over a period of eight years when a nearby development (St. James) with access to oceanfront amenities has yet to reach sellout after nearly 30 years.

    iii)    The Whisper Mountain property in rural Madison County, North Carolina is located adjacent to an existing mountain-lifestyle residential development that has been very slow

---

[20] The eight Roberts Appraisals may be identified by name, State, and donation year as follows: Chestatee Holdings (GA, 2015), Equity Investment (NC, 2018), Whisper Mountain (NC, 2015), Mountaintop (NC, 2014), Ft Myers (NC, 2013), Thompson Mountain (NC, 2014), River Club Holdings (NC, 2014), and Inland Bluffton (SC, 2014).

to develop, and yet the Roberts appraisal claims that the subject property would somehow be able to be economically successful.

iv) The Roberts appraisal of the Mountaintop Property Investment envisions twelve "new" homesites along a narrow strip of steep, mountainous terrain situated atop a failed development that had more than 50 unsold homesites at the date of appraisal.

v) The Ft Myers property in North Carolina is a heavily wooded and steeply sloped property that is located three and one-half miles directly down-wind from a paper processing plant that emits noxious odors and dust. The donated property was known to be the site of a failed golf-course and residential development from the late 1980s.

vi) The Thompson Mountain property is an isolated tract of rugged, mountainous terrain located immediately adjacent to the Ft Myers property and that suffered from the same locational and economic challenges.

vii) The River Club Holdings property in North Carolina was a remnant part of an existing, failed residential development. The nine-lot fictional development plan advanced by Roberts was actually land area reserved for common-area open space and was not able to be developed or sold. Roberts's appraisal suggests that these unplatted nine lots could be sold over just a 15-month period at an average price of $432,000 each; in actuality, the French Broad Crossing development surrounding the subject property was able to sell only six lots in the four years prior to the appraisal and at an average price of just $86,000.

viii) The Inland Bluffton property in South Carolina is an oddly shaped strip of low-lying land area claimed to have highway access when in fact there was no public roadway frontage at the time of Roberts's appraisal.

14

30.  In each instance, the Roberts Appraisals fail to properly describe or analyze the donated properties. The analysis offered by Roberts is superficial, lacks accurate detail and support, and is misleading. His appraisals either misstate or underrepresent (or ignore) certain characteristics of the site critical to a proper understanding of the donated properties when viewed as development opportunities. These errors, misrepresentations, and omissions mask the reality that the donated properties each suffer from physical, economic, and legal shortcomings.

31.  Each of the Roberts Appraisals arrive at a conclusion that a change in use from the then current use as vacant land (or a failed development) to a higher use (as a completed residential subdivision development) is the most likely market outcome for the subject property. Although material to understanding the true value for the donated properties, the Roberts Appraisals do not analyze or discuss why the original development concept failed to materialize. Instead, Mr. Roberts presents data and information external to the donated properties and their locations as evidence[21] why the fictionalized or hypothetical development scheme could somehow thrive alongside the original failed real estate development that has been carefully reimagined as fresh economic opportunity.

32.  In the appraisal profession, when an appraisal offers a change in use, a rigorous marketability study (including a fundamental demand analysis) is required.[22] The detailed market analysis required in support of a change in use was never provided in any of the Roberts Appraisals.

---

[21] For example, offering allegedly analogous comparisons to financially successful developments located in different, far-away markets.

[22] *The Appraisal of Real Estate*, 14th Edition, (pp. 307–327) describes both inferred demand analysis and fundamental demand analysis. Complex and large properties, such as proposed residential subdivisions, that are appraised assuming a specific development timing require, at a minimum, a Level C market analysis that includes a fundamental demand analysis component (p. 315, 327). Proposed subdivision developments based on a specific land use plan that is drawn to the site and including a cost estimate for the subject development require an even higher (i.e., Level D) fundamental demand analysis (p. 314). An appraiser who fails to incorporate the proper level of market/marketability analysis in an appraisal assignment fails to apply recognized methods and techniques of the appraisal profession and violates the Competency Rule of USPAP.

33.  The Roberts Appraisals do not develop either a market analysis or a marketability analysis for the subject properties. Although the overall process is commonly referred to as market analysis, all appraisals must also include what is more precisely labeled a marketability study for a subject property. A marketability study includes a critical analysis of how the subject property competes in its local market, but only after completing a macroeconomic analysis of the property's competitive market area (i.e., the market analysis). This two-stage process results in an estimate of the subject property's proportional capture of present and future market demand.

34.  At no point do the Roberts Appraisals analyze or quantify market demand factors for the subject properties' potential development to justify a potential change in property use from vacant land, especially given that many of the subject properties were adjacent to land areas that had already commenced development and then subsequently ceased.

35.  A recent authoritative text addressing the practical application of land valuation techniques provides the accompanying graphic of the well-established understanding of the principal components of properly developed appraisal of vacant land.

36.  As the graphic shows, a proper market valuation requires a deliberate and sequential process. First, an appraiser must collect and analyze data related to supply and demand for similar land in similar, relevant markets. Second, the appraiser must conduct a market analysis to identify the existence of demand. Third, this underlying data, once analyzed, forms the basis of an appraiser's estimation of the highest and best use of the land in the relevant market (e.g., given supply and demand data, a particular type of development or land improvement is most desirable). Then, and only then, is an appraiser equipped to calculate the market value of the land.



37.  As detailed in my draft review reports, Mr. Roberts does not attempt to analyze the subject property's competitive market. He does not analyze the supply of equally desirable substitute properties, which means that he does not conduct a market analysis. Without studying the supply and demand in the subject property's local market (for large acreage development sites) there is no economic support for the conclusion of the properties' highest and best use. Absent a complete market analysis and a supported highest and best use opinion a credible market valuation is impossible.

38.  The Roberts Appraisals fail to conduct a proper highest and best use analysis due to the numerous missing and required components of the required market analysis study for a residential subdivision development and the required marketability study of the specific property development proposal that are integral to the highest and best use analysis process. There are no existing and prospective demand analyses conducted and there are no current and prospective supply analyses performed in the Roberts Appraisals. Consequently, there is no residual demand analysis (i.e., a market study), and there is no subject capture analysis in the report (i.e., a marketability study). All four of these missing steps are critical in an appraisal's highest and best use analysis when a change in use is claimed, and they are absolute requirements for developing a supportable valuation conclusion when a significant change in the property's highest and best use is concluded. Because the Roberts Appraisals fail to perform these four indisputably necessary steps, the resulting highest and best use analyses (and subsequent value opinions) are incomplete, inaccurate, inadequate, irrelevant, and unreasonable.

39.  For example, in his appraisal of the Thompson Mountain property, Mr. Roberts includes the following flawed analysis:

- The claimed highest and best use is an apparent fictionalized 77-lot subdivision involving a luxury lodge and "wellness center" that is intended to be developed in association with a former failed development from the 1980s (Turnpike Inn Golf Club). The development of the Turnpike golf course began in 1988 but never completed construction, resulting in a well-known financial mistake. The property has remained vacant for nearly 30 years.

- Roberts' appraisal mischaracterizes the property as rolling with "some steep mountainside topography" when in actuality, the entire site is steeply sloped with 90% of the property comprised of slopes greater than 30% grade.

- The non-specific and generalized nature of the analysis offered sidesteps (or chooses to disregard) the realities of the local marketplace that have apparently caused the adjoining Turnpike golf course development to fail.

40.  Moreover, the Roberts Appraisals sidestep (or choose to disregard) actual evidence of prices paid for other nearby properties similar to the subject properties that offer reliable and credible indications of market value. In none of the appraisals does Mr. Roberts consider prices paid for other properties in the local areas. This is contrary to long-established real estate appraisal practice and methodology. My research indicated that there were many sales of similar properties located near the subject properties that could be analyzed to determine an accurate measure of value for the donated properties.

41.  The table below presents the number of sale transactions identified by JLL as part of the review assignment for each of the donated properties appraised by Roberts. In each instance, my team and I were able to identify an adequate number of sales that could be analyzed. Shown are the total number of transactions found, the number remaining after controlling for the valuation date and for property size, and the resulting average price paid for land in the same market as the donated properties. The average price paid is expressed on a per acre basis for comparison purposes.

| | Chestatee | Equity Invest. | Whisper Mountain | Mountaintop Property Invest. | Ft Meyers | Thompson Mountain | River Club | Inland Bluffton |
|---|---|---|---|---|---|---|---|---|
| Qty. of sales found in local market | 400 | 2,000 | 1,600 | 1,200 | 1,600 | 1,600 | 1,200 | 120 |
| Qty. of sales after narrowing for value date and property size | 26 | 26 | 21 | 53 | 21 | 21 | 21 | 19 |
| Average price paid per acre in local market (actual) | $7,286 | $2,695 | $3,891 | $8,798 | $3,891 | $3,891 | $6,813 | $9,362 |

42. The next table combines the prices paid in the local market and the Roberts value conclusions, together with a ratio representing the degree to which the Roberts Appraisals overvalue the land.

| | Chestatee | Equity Invest. | Whisper Mountain | Mountaintop Property Invest. | Ft Meyers | Thompson Mountain | River Club | Inland Bluffton |
|---|---|---|---|---|---|---|---|---|
| Average price paid per acre (actual) | $7,286 | $2,695 | $3,891 | $8,798 | $3,891 | $3,891 | $6,813 | $9,362 |
| Taxpayer Appraisal Value (per acre): | $179,000 | $141,000 | $78,000 | $954,000 | $187,000 | $114,000 | $147,000 | $183,000 |
| Ratio of Overvaluation | 24.6 | 52.3 | 20.0 | 108.4 | 48.1 | 29.3 | 21.6 | 19.5 |

43. The chart below isolates the sale data for a single Roberts appraisal, Ft Myers, to provide an example of how Mr. Roberts's decision to ignore local market data results in an overvaluation of the land. My team and I identified 21 nearby sales of vacant land properties between 100 acres and 600 acres in size that occurred between 2012 and 2016 with a resulting average price of $3,891 per acre. In November 2013, Mr. Roberts, without support, valued the Ft Myers property, which encompassed 408 acres, at $187,000 per acre. The relative difference in price per acre is readily apparent.



44. A similar comparison has been performed for each of the Roberts Appraisals. The chart below presents the cumulative graphing of the "local sale data" shown in blue color alongside the Roberts value conclusions (shown in red). In each case, Mr. Roberts ignores local market data to reach a grossly inflated and unsupported value for the subject property.

21



45. In arriving at his value conclusions, Mr. Roberts eschewed a sales comparison approach, the standard appraisal methodology, and relied solely on a discounted cash flow analysis. The Roberts DCF model is based on assumptions that are unsupported by reasonable market evidence.

46. According to *The Appraisal of Real Estate*, when applying the discounted cash flow analysis (otherwise referred to as the subdivision development method), the appraiser must consider the three phases of development: (1) the permitting stage; (2) the construction stage; and (3) the absorption stage.

47. Across these three phases of development, an appraiser must perform multiple steps, that, when adequately addressed and supported, produce credible results. However, the Roberts Appraisals do not properly perform the necessary steps and therefore contain the following major flaws:

- Failure to affirm a supportable subdivision development plan.

- Failure to discuss the timing and cost involved with permitting for approval of the proposed development.

- Failure to provide support for the concluded lot pricing and absorption in the proposed development.

48.   Although there are additional shortcomings of the discounted cash flow analysis within the Roberts Appraisals, when I corrected for just one of the inputs, the Roberts Appraisals' values plummeted significantly. When I adjusted the lot-price input offered by Roberts to align more closely with market-supported figures, the Roberts Appraisals' value conclusions fall to nearly zero dollars and, in most cases, negative values. Two examples reveal this shortcoming:

- In the analysis of River Club Holdings, the Roberts appraisal describes and displays a discounted cash flow analysis for 9 lots that would somehow sell at an average price of $432,000 per lot. Yet, more than 100 lots within a pre-existing development remained unsold as of the date of Roberts's appraisal.[23] The Roberts appraisal DCF analysis concludes a value of $2,495,000. Simply modifying the unsupported DCF model to account for a market-supported lot price[24] results in a drop in value of more than $2,300,000, leaving a corrected value of just $50,000 for the entire parcel.

- In the analysis of Whisper Mountain, the Roberts appraisal offers a DCF analysis for 61 residential homesites that would somehow sell at a price of $476,000 per lot. Yet, more than 70 lots within a pre-existing development remained unsold at the time of Roberts's appraisal. The Roberts DCF analysis concluded a value of $13,870,000. Modifying the DCF model to account for a market-supported lot price input results in a drop in value of more than $14 million, leaving a present value of **-$965,000**.

---

[23] These existing homesites failed to sell even at prices that were far lower than the unsupported pricing levels claimed by Mr. Roberts.

[24] In actuality the existing River Club development (French Broad Crossing) was able to sell only six lots in the four years prior to the value date and at an average price of just $86,000.

### VIII.   Summary of Conclusions Concerning the Roberts Appraisals

49.   In each of the Roberts Appraisals the value attributed to the donated property far exceeded the range of supportable values present within the local marketplace resulting in extreme overvaluation of between 20 times and 108 times.

50.   In each case, the Roberts's value conclusions exceeded the actual purchase prices paid for the donated properties by between 6.6 and 206.3 (and an average of 70.3) times. Mr. Roberts never attempted to explain the comparative relationship between the acquisition cost of the donated (subject) properties and the predominant price paid for vacant land in the local market areas.

51.   In every instance, the Roberts Appraisals fail consistently to account for supply of properties that are similar to and directly compete with the donated properties and never conduct a fundamental demand analysis for the claimed change in highest and best use. There is nothing in the Roberts Appraisals that indicate there was any effort to "analyze the factors, conditions, data, and other information that would have a significant effect on the credibility of the assignment results" regarding the unsupported and abnormally high value conclusions for the donated properties, as required by the USPAP.

52.   In my opinion, the imbalance between market-supported evidence of prices paid in the local market and the appraised value conclusions claimed in the Roberts Appraisals may be explained by the following:

- The Roberts Appraisals misrepresent the subject properties as highly marketable development opportunities when in fact the donated properties are more accurately described as vacant raw land and, in most cases, represent a remnant of a failed (or stalled) development.

- The Roberts Appraisals fail to represent that the donated properties are not unique in physical, economic, or legal attributes within the local market areas in which they compete; the Roberts Appraisals do not demonstrate that the donated properties are unique within their markets.

- The Roberts Appraisals sidestep (or choose to ignore) local market evidence of prices paid for other nearby properties similar to the donated properties.

- The Roberts Appraisals fail to offer evidence of market demand required to substantiate a change in use from the then current use of vacant land to that of a residential development requiring significant investment.

- In most cases, research into the actual status of the subject properties when viewed as development opportunities revealed that they were in actuality comprised of un-platted vacant land.

- The financial feasibility and associated income approaches to value (DCF analysis) are erroneously constructed and lack market supported inputs causing them to produce unreliable and misleading estimates of value.

- The Roberts Appraisals violate the USPAP and the generally accepted methodology for valuing vacant land properties, and the Roberts Appraisals are misleading and not appropriate because they contain numerous, substantial, and serious errors, omissions, inaccuracies, misrepresentations, and misstatements of fact. As a result, the Roberts Appraisals, and the analyses within them, are not credible or reliable as evidence of the fair market value of the subject properties' values.

- All of these serious errors, omissions, inaccuracies, misrepresentations and misstatements of fact, individually and collectively, serve to only *increase* the value of the donated property and contribute to the gross overvaluation present in the Roberts Appraisals.

25

53.  Finally, when the subject properties are accurately described, and their competitive position within their local markets are properly identified, an analysis that employs generally accepted valuation techniques results in a value that is drastically lower than the grossly inflated values offered in the Roberts Reports.

54.  I, Charles T. Brigden, approve the foregoing disclosure:

**By:**

Charles T. Brigden, MAI, CRE, FRICS
North Carolina License No. A8546

**Date:**      December 23, 2022

26

**ADDENDA**

**EXHIBIT A:**

**QUALIFICATIONS OF CHARLES T. BRIGDEN, MAI, CRE, FRICS**

## CONSERVATION & PRESERVATION EASEMENT QUALIFICATIONS

Charles T. Brigden, MAI, CRE, FRICS, Managing Director of JLL Valuation & Advisory Services LLC (JLL VAS) is a real estate appraiser with extensive experience in the valuation of many types of less-than-fee interests, including preservation and conservation easements.

JLL VAS is one of the most experienced firms in the country in the review, analysis, evaluation, and appraisal of properties encumbered by historic preservation, facade and conservation easements.

Mr. Brigden and other members of his company have been involved in the evaluation or appraisal of conservation and preservation easements in about 25 states and 40 cities including Chicago, Boston, New York, Philadelphia, Washington, D.C., Indianapolis, Cleveland, Cincinnati, Pittsburgh, Minneapolis, St. Louis, Omaha, Louisville, Nashville, Memphis, Atlanta, Asheville, New Orleans, San Antonio, Santa Fe, Denver, Los Angeles, and Seattle, as well as in such rural and scenic areas as the foothills of the Big Horn Mountains near Sheridan, Wyoming, Sundance ski area in Utah, Steamboat Springs and Rocky Mt. National Park in Colorado, the eastern shore of Maryland, southern Virginia, the mountains of North Carolina, and forests in Maine, New Hampshire, Pennsylvania and Florida. JLL VAS staff have also appraiser conservation easements on more than 100,000 acres of land (including 25 miles of coastline) in Chile and on two large estancias (ranches) in Argentine Patagonia.

Conservation easement valuation clients of Mr. Brigden and his firm have included both the Internal Revenue Service and the U.S. Department of Justice as well as individual taxpayers and law firms. JLL VAS staff have also been review appraisers for the Department of Justice on both preservation easements and conservation easements involving more than a dozen other properties in a number of locations across the United States, and have previously worked for the Department of Justice and indirectly the IRS on an assignment involving the review of more than 4,000 appraisals involving the charitable donation of partial interests (timeshare resort intervals).

As part of their ongoing easement related work, Mr. Brigden and JLL VAS staff periodically conduct regional and national surveys of sales of easement encumbered property.

Mr. Brigden and other members of the firm have appeared nationally on easement valuation programs sponsored by such organizations as the Appraisal Institute, the Land Trust Alliance, the National Trust for Historic Preservation, The Conservation Foundation, Continuing Legal Education in Colorado, Inc., the Texas Historical Commission, Arizona Open Land Trust, Historic Nashville, Inc., the Landmarks Preservation Council of Illinois, the Illinois Institute for Continuing Legal Education, the Boston Bar Association, Utah Open Lands and Utah Heritage, the Chicago Bar Association, and the American Bar Association.

JLL VAS staff have also helped communities and even states establish easement programs. Organizations assisted by preparing model easement documents and informational booklets on the easement concept include the Landmarks Preservation Council of Illinois, the Frederick Law Olmsted Society of Riverside, Illinois, the City of Chicago Landmarks Commission, the Trust for Public Land, the Land Trust Exchange, and the City of Lake Forest, Illinois. JLL staff were also involved in the drafting of the model historic preservation easement used by the National Trust for Historic Preservation and the Land Trust Alliance.

Mr. Brigden works together with his colleague, Richard J. Roddewig, MAI, CRE, FRICS, on most preservation and conservation assignments and has done so for more than 20 years. Mr. Brigden and Mr. Roddewig are the co-authors of Appraising Conservation and Historic Preservation Easements, Second Edition, a 2020 textbook on the topic published by the Appraisal Institute. Mr. Brigden and Mr. Roddewig co-developed the Appraisal Institute's *Appraising Historic Preservation Easements* course and the *Appraising Conservation Easements* course. JLL VAS staff including Roddewig and Brigden have presented at national programs and seminars on appraisal of conservation and historic preservation easements.



JLL VAS staff have appraised more than 300 conservation and preservation easements across the United States and South America since the early 1980s. One or the other, or both, managing staff members Roddewig and Brigden have been involved in all of these assignments. Some of the assignments have also involved providing expert witness testimony for IRS and DOJ agents and attorneys concerning the fair market value of donated preservation and conservation easement interests.

JLL VAS staff have written extensively on the topic of easement valuation including two articles in *The Appraisal Journal* and the seminal textbook describing the appropriate methods of valuing preservation and conservation easements.

**EXHIBIT B:**

**CHARLES T. BRIGDEN, MAI, CRE, FRICS**

**GENERAL QUALIFICATIONS AND LIST OF PUBLICATIONS**

## JLL Biography



# Charles T. Brigden, MAI, CRE, FRICS

**Managing Director**

**Overview**
Charles T. Brigden, MAI, CRE, FRICS is Managing Director of JLL Valuation & Advisory Services, LLC (VAS), which is part of Jones Lang LaSalle, one of the largest full service real estate firms in the world with offices in more than 80 countries. Between 2002 and 2017, Mr. Brigden was Vice President of Clarion Associates, Inc., one of the most experienced firms in the United States in the valuation of complex real estate assets with a focus on litigation-related assignments. Mr. Brigden has more than 20 years of experience in complex valuation assignments including historic and special purpose properties and the evaluation of the impact of environmental contamination situations on real estate prices, markets and values.

**Experience**
Mr. Brigden works nationally out of the Chicago office of JLL VAS and directs all large valuation and litigation assignments. He is currently a certified general real estate appraiser in Wisconsin and many other states. Mr. Brigden specializes in complex real estate assignments typically involving litigation or the threat of litigation. The valuation of special purpose and historic properties and the analysis of properties potentially affected by environmental contamination make up the majority of his practice.

Among the notable assignments performed by Mr. Brigden include:

- expert witness testimony and litigation support for lawsuits involving the major environmental disasters following Hurricane Katrina, the Enbridge pipeline rupture in Michigan and the Gulf Oil spill;
- the valuation of more than 27,000 homebuilder assets as part of the TOUSA, Inc. bankruptcy proceeding;
- the valuation of more than 4,000 timeshare assets in more than 25 states and at least 10 foreign countries, and
- the valuation of the only private landholding located within the secret military facility known as Area 51.

Additionally, Mr. Brigden has extensive experience appraising conservation and historic preservation easements, both for taxpayers and the United States Government.



*Directs JLL Valuation Advisory's complex valuation and litigation assignments across the United States.*

*Certified General Real Estate Appriaser with more than 20 years of experience.*

COPYRIGHT © JONES LANG LASALLE IP, INC. 2022. All Rights Reserved

1

**Education and Affiliations**
- Designated Member (MAI), Appraisal Institute
- Designated Member (CRE), Counselors of Real Estate
- Midwest Chapter of the Counselors of Real Estate, Chairman, 2016 to Present
- Counselors of Real Estate, Board of Directors, 2019 to 2021
- Designated Member (FRICS), Royal Institute of Chartered Surveyors
- Current Certified General Real Estate Appraiser in more than 25 states
- Master of Real Estate – University of Wisconsin-Madison
- Bachelor of Architecture – University of Wisconsin-Milwaukee
- Board of Trustees – Hinsdale, Illinois Historical Society, 2016 to 2022

**Prior Experience**

Vice President – Clarion Associates, Inc., 2002 to 2017, Chicago, Illinois

Senior Financial Analyst – MarketPlace Development, 1998 to 2002, Boston, Massachusetts

Development Associate – The Fiore Companies, 1996 to 1998, Madison, Wisconsin

Project Assistant – The Johnson Controls Institute for Environmental Quality in Architecture, 1995 to 1996, Milwaukee, Wisconsin

**Publications and Articles**

The Appraisal of Real Estate, (15th Edition) Chicago: Appraisal Institute, 2020, (contributor)

"Measuring Post-Remediation Stigma in Construction-Defect and Environmental Contamination Class Actions." With Richard J. Roddewig, DRI For the Defense, June 2020.

Appraising Conservation and Historic Preservation Easements, (2nd Edition) Chicago: Appraisal Institute, April 2020, (co-author).

Corridor Valuation: An Overview and New Alternatives, (Chicago: Appraisal Institute, the International Right of Way Association, and the Appraisal Institute of Canada, 2019) (co-author).

"Timeshare, Market Value, and the Real Estate Appraisal Process," with Richard J. Roddewig, in *The Appraisal Journal*, Spring 2019, Volume LXXXVII, Number 2 (Chicago: Appraisal Institute, 2019, p. 95).

"A Pipeline Spill Revisited: How Long Do Impacts on Home Prices Last?," with Richard J. Roddewig and Anne S. Baxendale, in *The Appraisal Journal*, Winter 2018, Volume LXXXVI, Number 1 (Chicago: Appraisal Institute, 2018, p. 23).

"Determining Real Estate Damages from Natural Disasters: Real Estate Counseling in Class Action Litigation – Lessons from Hurricane Katrina," with Richard J. Roddewig and Gary R. Papke, in *Real Estate Issues*, Volume 37, Issues 2 and 3 (Chicago: The Counselors of Real Estate, December 2012, p. 77).

"Power Lines and Property Prices," with Richard J. Roddewig, in *Real Estate Issues*, Volume 39, Number 2 (Chicago: The Counselors of Real Estate, 2014, p. 15).

**Awards and Honors**

Recipient (2016) of James Schroeder Award given by the Appraisal Institute (Chicago Chapter).

Recipient (2015) of the Roland J. Rives Award given by the Appraisal Institute (Chicago Chapter).

Co-recipient (2013) of the William S. Ballard Award as the "author whose work best exemplifies the high standards of content maintained by *Real Estate Issues*, the professional journal published by The Counselors of Real Estate."

**Contact**
T: +1 312 228 3331
M: +1 773 655 9584
E: charles.brigden@am.jll.com

COPYRIGHT © JONES LANG LASALLE IP, INC. 2022. All Rights Reserved

2

# EXHIBIT C:

Charles T. Brigden, MAI -- Trial & Deposition History (2018 - 2022)

| Case Name | Case Number | Court | Case Location | Date | Testimony Given |
|---|---|---|---|---|---|
| *United States v. 400 Acres of Land, more or less situate in Lincoln County, State of Nevada; and Jessie J. Cox, et al.* | 2:15-cv-01743-MMD-NJK | United States District Court for the District of Nevada | Lincoln County, NV | 1/26/2018 | Deposition |
| *Brocksopp v. Insulation Technologies Inc., et al.* | 2017CV001580 | State of Wisconsin Circuit Court – Racine County | Racine, WI | 9/10/2019 | Deposition |
| *Michele Baker, et al. v. Saint-Gobain, et al.* | 1:16-CV-917 | United States District Court for the Northern District of New York | Hoosick Falls, NY | 11/13/2020 | Deposition |
| *Grande Vista of Orlando Condo Association, Inc., v. Rick Singh, et al.* | 2018-CA-013570-O | Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida | Orlando, FL | 11/9/2022 | Deposition |
| *Citgo Petroleum Corporation and U.S. Venture, Inc., v. City of Milwaukee* | 16-CV-5638 | State of Wisconsin Circuit Court – Milwaukee County | Milwaukee, WI | 11/11/2022 | Deposition |
| *Luther Bond, et al. v. Waste Management of Pennsylvania, et al.* | C-48-CV-2019-02017 | Court of Common Pleas, Northampton County, Pennsylvania | Pen Argyl, PA | 12/5/2022 | Class Certification Hearing (Bench Trial) |

Version: December 2022

34

CERTIFICATE OF SERVICE

I hereby certify that on January 10th, 2023, I electronically filed the

foregoing filing with the Clerk of the Court using CM/ECF system, which will

automatically send e-mail notifications of such filing to all attorneys of record.

/s/ Randy S. Chartash
Randy S. Chartash
GA Bar No. 121760